[No. 3404. Decided April 23, 1901.]

JOHN S. PAGE *et ux., Appellants,* v. PIERCE COUNTY *et al., Respondents.*

INDIAN LANDS — SALE BY GOVERNMENT— EXEMPTION FROM TAXATION.

    Under the rule that the states cannot tax lands which belong to the federal government or over which it has retained the right of control, lands on an Indian reservation, including those belonging to the government agency and those which have been assigned in severalty, pursuant to treaty, are exempt from state taxation, where they have been sold and deeded under act of Congress to purchasers from whom deferred payments thereon remain due, and, by the terms of the act, the deeds are conditioned that they should operate as a complete conveyance only upon full payment of the purchase money.

Appeal from Superior Court, Pierce County.—Hon. THOMAS CARROLL, Judge. Reversed.

*James Law* and *Herbert S. Griggs,* for appellants.

*George H. Walker* and *John A. Shackleford,* for respondents.

The opinion of the court was delivered by

ANDERS, J.—Plaintiffs brought this action against Pierce county and Stephen Judson, it's treasurer, to enjoin the collection of taxes on lands within the Puyallup Indian reservation, on the ground that the land is not subject to taxation by the state. The Puyallup reservation exists under and by virtue of a treaty with the Indians thereof, made on December 26, 1854. 10 Stat. at Large, 1132. In 1893 congress passed an act providing, with

the consent of the Indians, for the sale and disposal of the lands of this reservation (27 Stat. at Large, 612), and it is under this act that the plaintiffs have acquired whatever rights they have to the lands upon which the tax complained of was levied. The lands were offered for sale under the provisions of the act, and were purchased by the plaintiffs. One-third of the purchase price was paid down, and the remainder was to be paid in installments. Deeds were executed by the commissioners appointed for that purpose, conditioned that the deeds should operate as a complete conveyance of the land upon the full payment of the purchase money. The deferred payments had not been fully made at the time this action was commenced. The proceeds of the sale were to be placed in the treasury for the benefit of the Indians. The taxes mentioned in the complaint are for the year 1897. A portion of the lands over which this controversy arises was acreage, and had been patented to one of the Indians on said reservation, subject to certain conditions specified in the treaty. The lands were not subject to sale by the Indians, and there is no question as to the authority of the United States or of the commissioners acting by virtue of the authority of the act of 1893 to dispose of the lands. A demurrer to the complaint was sustained, and the plaintiffs have appealed from a judgment dismissing the action.

It is conceded that the lands were not subject to taxation prior to the execution of the deeds to the appellants, and the question for determination is whether the appellants by reason of the deeds above mentioned, have such a title to the lands in question that they are subject to taxation as their individual property. The case of *Railway Co. v. Prescott,* 16 Wall. 603, involved the right of the state of Kansas to tax the lands granted by congress in aid

of the construction of the Kansas Pacific Railway. Subsequently, in 1864, the original act making said grant was amended before any rights accrued to the company. The amendatory act provided (13 Stat. at Large, p. 365, § 21):

"That before any land granted by this act shall be conveyed to any company or party entitled thereto under this act, there shall first be paid into the treasury of the United States the cost of surveying, selecting, and conveying the same, by the said company or party in interest, as the titles shall be required by said company, which amount shall, without any further appropriation, . . . be used by the commissioner of the general land office for the prosecution of the survey of the public lands along the line of said road, and so from year to year until the whole shall be completed, as provided under the provisions of this act."

The railway filed its bill to quiet its title to certain of the granted lands against one Prescott, setting up title only by virtue of this grant. The defendant set up a tax title under a sale for taxes assessed in 1868. It was conceded that at the time the lands were assessed the railroad company had performed all of the conditions precedent to acquiring a patent, except the payment of the costs of survey. The court held that the non-payment of the costs required to be paid by the statute exempted the lands from taxation. In the course of the opinion the court said:

"While we recognize the doctrine heretofore laid down by this court that lands sold by the United States may be taxed before they have parted with the legal title by issuing a patent, it is to be understood as applicable to cases where the *right* to the patent is complete, and the equitable title is fully vested in the party without anything more to be paid, or any act to be done going to the foundation of his right. The present case does not fall within that principle."

The reasons given by the court in this case for denying the right of the state to tax the railroad lands were that:

"If the company have such an interest in these lands that they can be sold by the state under her power of taxation, then the title is divested out of the government without its consent, and the right to recover the money expended in the surveys is defeated. As the government retains the legal title until the company or some one interested in the same grant or title shall pay these expenses, the state cannot levy taxes on the land, and under such levy sell and make a title which might in any event defeat this right of the federal government reserved in the act by which the inchoate grant was made."

The same views have been repeatedly expressed by the supreme court of the United States in subsequent decisions. See *Railway Co. v. McShane*, 22 Wall. 444; *Northern Pacific R. R. Co. v. Traill County*, 115 U. S. 600 (6 Sup. Ct. 201). In fact it is conceded that this was the rule established by the earlier decisions, but it is contended by respondents that later decisions of that court have overruled the earlier ones, and that now such lands are taxable, and they cite *Central Pacific R. R. Co. v. Nevada*, 162 U. S. 512 (16 Sup. Ct. 885), and *Maish v. Arizona*, 164 U. S. 599 (17 Sup. Ct. 193), in support of their contention. An examination of the case of *Central Pacific R. R. Co. v. Nevada, supra,* will disclose the fact that lands granted in aid of the construction of railroads were made taxable by an act of congress passed in 1886, notwithstanding the cost of survey and selection had not been paid by the company. This act was passed after the case of *Railway Co. v. Prescott,* and others announcing the same doctrine, had been decided, and expressly permitted the states to tax the interest owned by the railroad company; and the ruling in this case was based

entirely upon the provisions of that act.  In *Maish v. Arizona*, 164 U. S. 599 (17 Sup. Ct. 193), one of the questions to be determined was whether the territory of Arizona had the right to tax certain lands included in a Mexican grant before there had been a confirmation of the grant by the government.  The court, in considering this question, says:

"The cases relied upon are *Colorado Company v. Commissioners*, 95 U. S. 259, *Botiller v. Dominguez*, 130 U. S. 238, and *Astiazaran v. Santa Rita Land & Mining Co.*, 148 U. S. 80.  In the first of these cases a Mexican land grant, covering some five hundred thousand acres, was confirmed by congress to the extent  of eleven  square leagues, with a proviso that there should be a survey of those leagues, and that the confirmation should not become legally effective until the claimant had paid the cost thereof; and it was held, following *Railway Company v. Prescott*, 16 Wall. 603, and *Railway Company v. McShane*, 22 Wall. 444, that until the survey fees had been paid the United States retained such an interest in the land as to exempt it from taxation.  .   .   .   It must be borne in mind that in the record before us these lands are not otherwise described than as Mexican land grants.  For aught that appears, they may have been 'perfect grants.'"

From the language employed and the reasoning of the court in the opinion in this case, we feel justified in concluding that, if it had been made to appear that the grant to the claimant was an "imperfect," or, in other words, a conditional, one, the right to tax the land would have been denied.

It is, perhaps, needless to say that the act of congress of 1886, authorizing the taxing of certain railroad lands, confers no authority to tax any other lands in which the United States have an interest, as no other than railroad lands are mentioned in that act.  We fail to see any indi-

cation on the part of the supreme court of the United States either in *Central Pacific R. R. Co. v. Nevada* or *Maish v. Arizona* (cited by respondents) to overrule, impugn, or modify its earlier decisions upon this question of taxation. Each case was decided strictly in accordance with the court's construction of the particular statute applicable thereto. In the railroad cases above cited the government had not parted with the legal title to the land in question; but it would seem that the decisions were not based on that ground alone, for it was intimated in the case of *Railway Co. v. McShane* that, so long as government had an interest in the land, either legal or equitable, the land was not taxable by the state. In that case it was contended by the state that, because the government had authorized the railway company to mortgage the lands, it had thereby parted with the legal title, and the land was, therefore, properly taxed by the state. But in answer to this proposition the court said:

"It is not necessary to go into the merely technical question whether the legal title passed from the United States by virtue of that mortgage and the act of congress which authorized it, nor whether, if it ever becomes necessary to foreclose that mortgage, the rights of the United States in the land would be divested by the proceeding, because we are satisfied that the United States, until she conveys them by patent or otherwise, has an interest, whether it be legal or equitable, which the state of Nebraska is not at liberty to divest by the exercise of the right of taxation."

It appears in the railroad cases hereinbefore mentioned that the really substantial interest of the government in the lands sought to be taxed consisted in its right to withhold the patent from the railway company, as a means of securing the payment of the expenses incurred in surveying the lands; and the fact that the legal title to the granted lands was not in the railroad company, but in the

United States, does not seem to us, in view of the language we have quoted from the opinion in the *Prescott Case,* to have been the determinant factor in the decision of the question before the court. In the *Prescott Case,* as we have seen, it was announced as the established doctrine of the court that lands may be legally taxed before the issuance of the government patent in cases "where the right to the patent is complete, and the equitable title is fully vested in the party without anything more to be paid, or any act to be done going to the foundation of his right." But it does not necessarily follow that lands are subject to state taxation merely by reason of the fact that they have been conveyed by the government, or with its consent, to a purchaser. That this is true is shown, we think, in the case of *The New York Indians,* 5 Wall. 761. In that case the legal title to lands of the reservation had been conveyed by the Indians who owned them, with the consent of the United States, to certain parties, who were entitled to purchase them. The Indians retained the right to possession for the period of five years after the sale. The government had no pecuniary or proprietary interest in the land, but it had in the treaty stipulated with the Indians that they should own the land until they should choose to sell it. A tax was levied on the land and made subject to this right of possession of the Indians, but the land itself was sold in default of payment of the tax. Upon this state of facts the tax was held to be premature and void. In *McCulloch v. Maryland,* 4 Wheat. 316, the broad doctrine was announced, in substance, that neither the property of the federal government nor any of the instrumentalities employed by it in the execution of its lawful powers and duties may be taxed by the states; and the rule there laid down has never, so far as we are advised, been departed from. One question before the

court in that case was whether the state of Maryland had the right, under the constitution of the United States, to tax the Bank of the United States, which was incorporated under and by virtue of an act of congress. The government did not own the bank, but employed it as a means of executing one of its constitutional powers; and the court, after a most thorough consideration of the question, held that the levying of the tax on the bank, or, rather, one of its branches, was an illegal interference with the right of the national government to exercise a power vested in it by a constitutional act of congress, and that the tax was therefore void.

Applying the doctrine announced in the decisions of the supreme court of the United States to the case at bar, it would seem reasonably clear that the lands in question cannot be taxed by the state so long as the government has an interest in them, "either legal or equitable," or is even charged with the performance of some obligation or duty respecting them. That the government had an interest in these lands at the time the tax complained of was levied is apparent from the fact that the deeds were not to operate as a complete conveyance until appellant paid the full purchase price of the lands, and the further fact that under the said act of 1893 the deferred payments were secured "by vendor's lien upon the property." It became the duty of the government, under the law and the treaty, to receive and disburse these payments for the benefit of the Indians, and it is manifest that, if the lands should be sold for taxes before the deferred payments are made, its lien would be destroyed, and its power to collect the money defeated. It is true that possessory rights to public lands may be taxed by authority of the legislature (*Central Pacific R. R. Co. v. Nevada, supra*), and under our statute improvements on land whose title

is still in the United States are taxable, but it must be borne in mind that the tax of which appellants complain was levied upon the land itself, and not upon a possessory right thereto, or improvements thereon.

We are satisfied that the complaint states a cause of action, and the judgment is therefore reversed, and the cause remanded, with directions to overrule the demurrer.

REAVIS, C. J., and FULLERTON and DUNBAR, JJ., concur.