THE COURT.
 

 The appeals in several actions brought by the plaintiff, Standard Oil Company of California, involve the question whether sales of gasoline in certain national parks are subject to the tax imposed by the Motor Vehicle Fuel License Tax Act (Stats. 1923, p. 577, as amended Stats. 1933, p. 1643). These appeals have been consolidated for determination. A related question is presented in the companion case of
 
 Yosemite Park & Curry Co.
 
 v.
 
 Johnson, post,
 
 p. 770 [76 Pac. (2d) 1191], wherein the Sales Tax Act (Stats. 1933, p. 2599, as amended), is involved. The determination herein will control the disposition of the same questions presented in the Vosemite Park and Curry Company case, and the discussion herein with
 
 *760
 
 reference to the effect of the retail sales tax will be deemed sufficient for that purpose.
 

 Standard Oil Company by its several actions sought to recover gasoline taxes paid under protest, which were imposed for the distribution and sale of gasoline within the boundaries of Yosemite national park, Sequoia national park and General Grant national park, located within the territorial limits of California.
 

 The plaintiff is a private corporation authorized to do business in California. The problem revolves around the question whether the state of California ceded exclusive jurisdiction to the United States government of the areas comprising the various national parks in such a way as to divest itself of jurisdiction to impose and collect the taxes so paid under protest.
 

 Demurrers to the various complaints were sustained and judgment entered for the defendants. The plaintiff appeals.
 

 On February 2, 1848, by the treaty of Guadalupe Hidalgo, the Republic of Mexico ceded to the United States government all the lands within the territorial limits of California. The United States thereby became vested with the title to all such lands not held in private ownership.
 
 (Thompson
 
 v.
 
 Doaksum,
 
 68 Cal. 593, 596 [10 Pac. 199].) The areas now comprising the national parks hereinbefore mentioned were therefore then public lands. The United States retained title to these public lands upon the admission of California to statehood. (9 Stats. 452.)
 

 On June 30, 1864 (13 Stats. 325), that portion of Yosemite national park designated in the act as the “ ‘Cleft’ or ‘Gorge’ in the Granite Peak of the Sierra Nevada mountains situated in the county of Mariposa . . . and the headwaters of the Merced River, and known as the Yo-Semite valley”, was granted to the state of California upon the express condition that the ‘ ‘ premises shall be held for public use, resort, and recreation”. By the same act ‘‘Mariposa Big Tree Grove”, comprising four sections of land, was granted upon like conditions.
 

 On October 1, 1890 (26 Stats. 650), congress set apart as a national forest and withdrew from sale and occupancy certain tracts of the public lands in the Sierra Nevada, but expressly excepted therefrom the Yosemite Valley and Mariposa big tree grove theretofore granted to California. A
 
 *761
 
 portion of those reserves surrounding Yosemite Valley was later, on February 7, 1905, designated as “Yosemite National Park”. (33 Stats. 702.)
 

 On March 3, 1905 (Stats. 1905, p. 54), California receded and regranted to the United States without reservation the “Cleft” or “Gorge” known as Yosemite Valley, and the “Mariposa Big Tree Grove”, and resigned the trusts created and granted by the act of congress of June 30, 1864, upon condition that the lands be held by the United States for public use, resort and recreation. This recession was accepted by congress on June 11,1906 (34 Stats. 831),
 
 and the areas by the same act were included as part of Yosemite National Park.
 

 The area comprising Sequoia national park was withdrawn from occupancy and sale and dedicated' as a public park on September 24, 1890 (26 Stats. 478). An act of congress (26 Stats. 651), enacted on October 1, 1890, established General Grant national park.
 

 At the time of the recession to the United States of the Yosemite Valley and Mariposa big tree grove there Was in effect a statute passed by the legislature of California in 1891 (Stats. 1891, p. 262), providing: “The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this state and the service of civil process therein.”
 

 The plaintiff relies upon the foregoing quoted statute, together with the act of recession of 1905, as supporting its claim that the state of California by the regrant had relinquished exclusive jurisdiction to the United States in the area known as Yosemite Valley, wherein occurred most of the transactions upon which the taxes involved were imposed and collected.
 

 The defendant, however, contends that the act of the California legislature approved April 15,1919 (Stats. 1919, p. 74), ceding to the national government jurisdiction over Yosemite national park, Sequoia national park and General Grant national park, and the act of acceptance by congress on June
 
 *762
 

 2,
 
 1920 (41 Stats. 731), constitute the basis upon which depend the rights of the state herein.
 

 The legislative act of 1919 in its pertinent parts provides: ‘ ‘ Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all of the territory which is now or may hereafter be included in those several tracts of land in the State of California set aside and dedicated for park purposes by the United States as ‘Yosemite national park, Sequoia national park’ and ‘ General Grant national park’ respectively; saving, however, to the state of California the right to serve civil or criminal process within the limits of the aforesaid parks . . . and saving further, to the said state the right to tax' persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks. ...”
 

 The 1920 Act of Acceptance reads: “Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the provisions of the act of the legislature of the State of California (approved April 15, 1919), ceding to the United States exclusive jurisdiction over the territory embraced and included within the Yosemite National Park, Sequoia National Park, and General Grant National Park respectively, are hereby accepted and sole and exclusive jurisdiction is hereby assumed by the United States over such territory, saving, however, to the said State of California, the right to serve civil or criminal process within the limits of the aforesaid parks . . . and saving further to the said State the right to tax persons and corporations, their franchises and property on the land's included in said parks, and the right to fix and collect license fees for fishing in said parks. ...”
 

 The contention of the plaintiff is that the state, having by the 1905 act of recession, granted exclusive jurisdiction of Yosemite Valley to the United States, had nothing more to grant, and that the attempted cession of 1919 with reservations was an empty gesture. Answering this argument the defendant asserts that the 1905 act of recession did not vest exclusive jurisdiction in the United States, because, so he claims, such exclusive jurisdiction can be acquired only pursuant to clause 17, section 8, article I of the Constitution of the United States, which provides: “Congress shall have
 
 *763
 
 power to exercise exclusive legislation in all cases whatsoever . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings. ’ ’ In this connection reliance is also placed on section 6 of article XIII of the state Constitution, providing that the power of taxation shall never be surrendered or suspended by any grant or contract to which the state shall be a party.
 

 However, we deem it unnecessary to pursue the inquiry into the constitutional question whether exclusive jurisdiction may be ceded to or acquired' by the United States of lands within the territorial limits of a state solely for recreational and park purposes. We need note only that the history and reasons for the vesting in the United States of the power to hold exclusive jurisdiction for the enumerated purposes, and many aspects of the controversial question relating to acquisition of exclusive jurisdiction for other purposes, have been stated in the following cases, among others, and do not require repetition here:
 
 Fort Leavenworth R. R. Co.
 
 v.
 
 Lowe,
 
 114 U. S. 525, 533 [5 Sup. Ct. 995, 29 L. Ed. 264];
 
 Benson
 
 v.
 
 United States,
 
 146 U. S. 325 [13 Sup. Ct. 60, 36 L. Ed. 991];
 
 Arlington Hotel Co.
 
 v.
 
 Fant,
 
 278 U. S. 439 [49 Sup. Ct. 227, 73 L. Ed. 447];
 
 Surplus Trading Co.
 
 v.
 
 Cook,
 
 281 U. S. 647 [50 Sup. Ct. 455, 74 L. Ed. 1091];
 
 In re Kelly,
 
 71 Fed. 545;
 
 People
 
 v.
 
 Mouse,
 
 203 Cal. 782 [265 Pac. 944];
 
 Silas Mason, Inc.,
 
 v.
 
 State Tax Corn.,
 
 188 Wash. 98 [61 Pac. (2d) 1269], (affirmed 302 U. S. 186 [58 Sup. Ct. 233, 82 L. Ed. ----];
 
 Ryan
 
 v.
 
 State,
 
 188 Wash. 115 [61 Pac. (2d) 1276], (affirmed 302 U. S. 186 [58 Sup. Ct. 233, 82 L. Ed. ----].) Beginning at least as early as the decision in
 
 Fort Leavenworth R. R. Co.
 
 v.
 
 Lowe, supra,
 
 the Supreme Court of the United States recognized that exclusive jurisdiction could be acquired otherwise than by purchase with the consent of the state legislature, namely by cession, if for one or more of the purposes enumerated in the federal constitutional provision. (See
 
 Ryan
 
 v.
 
 State, supra,
 
 61 Pac. (2d) at 1281.) But whether exclusive jurisdiction by any means may be acquired for a purpose not so enumerated may still be an open question. (See
 
 Arlington Hotel Co.
 
 v.
 
 Fant,
 
 278 U. S. 439 [49 Sup. Ct. 227, 73 L. Ed. 447];
 
 In re Kelly,
 
 71 Fed. 545.) The controversial point that the United States has the constitutional power to acquire exclusive jurisdiction within state
 
 *764
 
 territorial limits of ail area devoted solely to park and recreational purposes was expressly left open in the Arlington Hotel ease at page 454. So far as we know only two eases have since attempted to resolve the question. In
 
 Yellowstone Park Transp. Co.
 
 v.
 
 Gallatin County,
 
 31 Fed. (2d) 644, (petition for writ of
 
 certiorari
 
 denied, 280 U. S. 555 [50 Sup. Ct. 16, 74 L. Ed. 611]), the court upheld the exclusive jurisdiction of lands ceded to the United States by the state of Montana for park purposes. The opinion shows that no concurrent jurisdiction or taxing power was reserved and that the express grant of powers to the United States was inconsistent with the reservation of any concurrent jurisdiction. The court supported its statement that “Cessions of exclusive jurisdiction such as that made by the Legislature of Montana, have been very common in the history of this country, and their effect is well settled ’ by the single reference to the Arlington Hotel decision. The other case,
 
 Yosemite Park & Curry Co.
 
 v.
 
 Collins,
 
 20 Fed. Supp. 1009 (Circuit Court of Appeals, Southern Div., Northern Dist. of California, No. 4165) will be later discussed.
 

 If the legislative act of recession of 1905, the congressional acceptance thereof, and the related acts prior to that time, were alone to be considered, it might be said that the constitutional question is squarely presented for determination. But as applied to all the territory named, we have a subsequent act of the legislature ceding title to the United States and expressly reserving, among other matters, the right to exercise in the territory ceded the power to tax persons and corporations, their franchises and property, together with a congressional acceptance in the same express terms. It is not a matter of necessary judicial inquiry as to what prompted these new acts of cession and acceptance, covering public lands reserved to the United States when California was admitted as a state, and lands formerly receded to the United States without the special reservation. It may be that the respective legislative bodies deemed that, except for the purposes enumerated in clause 17, section 8 of article I of the Constitution, and in accord with the declaration of section 6, article XIII of the state Constitution, the power had not been constitutionally delegated to the United States to hold land for other purposes exclusive of any dominion of the state, and that they therefore desired to reframe their agree
 
 *765
 
 ment to accord with the relative existing rights of the respective sovereigns. In any event, there exists no constitutional inhibition upon the power of the state to cede or the right of the United States to receive limited jurisdiction of lands for the purposes and with the reservations stated in the grant herein. The only proper function of the court, therefore, is to recognize and give effect to the act of recession of 1919 and the act of acceptance of 1920 which appear to constitute a binding and valid definition and mutual recognition of the rights and powers of the respective sovereign parties. All other related considerations fade away when it is realized that, whatever had taken place before, the taxing power of the state was reserved by the act of 1919 and that congress, by the acceptance act of 1920, recognized the continuance of that power in the state. This express recognition by both sovereigns clearly establishes the existence of the right of the state to tax' in the areas designated in accordance with the power as reserved and defined in both acts.
 

 It is not questioned that the United States may hold limited jurisdiction of land for other than the purposes enumerated in clause 17 of section 8 of article I of the Constitution ; and the cases relied upon do not preclude a holding that the extent of such limited jurisdiction for other than the specified purposes may be the subject of change by mutual agreement between the state and the United States.
 

 In
 
 Fort Leavenworth R. R. Co.
 
 v.
 
 Lowe, supra,
 
 at page 539, we find this statement: “It not being a ease where exclusive legislative authority is vested by the Constitution of the United States, that cession could be accompanied with such conditions as the State might see fit to annex not inconsistent with the free and effective use of the fort as a military post.” In that case the state by the act of cession of land to be used as a military post had reserved the power to tax railroad and other corporations. It was held that the reservation of the taxing power did not interfere with the use of the area as a military post and that there was no constitutional prohibition against the exercise of the reserved power. (See, also,
 
 Chicago & Pacific Ry. Co.
 
 v.
 
 McGlinn,
 
 114 U. S. 542, 545, 546 [5 Sup. Ct. 1005, 29 L. Ed. 270];
 
 United States
 
 v.
 
 Unzeuta,
 
 281 U. S. 138, 142 [50 Sup. Ct. 284, 74 L. Ed. 761].) The holding in the case of
 
 United
 
 
 *766
 

 States
 
 v.
 
 Unzeuta, supra,
 
 p. 143, that ceded jurisdiction which had been accepted could not be recaptured
 
 by the action of the state alone
 
 (which sought to amend the act of cession), is consistent with our conclusions herein. So, also, is the statement in
 
 In re Ladd, 14:
 
 Fed. 31, at page 38 (wherein a state amendatory act was held to be ineffective to abrogate the existing contract, and there was no express acceptance), that a ceded exclusive jurisdiction continues until “terminated, either by the United States ceasing to own and occupy the reservation, or by the United States retroceding its exclusive jurisdiction to the state”. Nor is
 
 Standard Oil Co.
 
 v.
 
 California,
 
 291 U. S. 242 [54 Sup. Ct. 381, 78 L. Ed. 775], in conflict. There the tax on gasoline (Stats. 1923, p. 571), was attempted to be laid on deliveries to the Post Exchange within the Presidio in San Francisco, a military reservation over which the United States was held to have been vested with exclusive jurisdiction under the constitutional section.
 

 We conclude that the legislative act of 1919 and the congressional acceptance of 1920 operate to reserve to the state the powers stated in the respective enactments.
 

 Another ground of resistance to the imposition of the sales and gasoline taxes in the national park areas is that such taxes, being in their nature excise taxes rather than taxes on persons or property, are not within the express reserved power.
 

 The reserved taxing power is couched in the following language : ‘ and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks”. It is asserted that inasmuch as a tax such as the retail sales tax or gasoline tax is in its nature an excise tax
 
 (People
 
 v.
 
 Ventura Refining Co.,
 
 204 Cal. 286, 294 [268 Pac. 347, 283 Pac. 60];
 
 Roth Drug, Inc.,
 
 v.
 
 Johnson,
 
 13 Cal. App. (2d) 720, 730 [57 Pac. (2d) 1022]), and being neither a tax on persons, such as a poll tax, nor a tax on tangible property, the power to impose it is not within the express reservation. The plaintiff misconceives the meaning and purpose of the phraseology employed. Contrary to its contention, the rule of strict construction does not necessarily apply. The pertinent considerations are stated in
 
 Ryan
 
 v.
 
 State, supra,
 
 61 Pac. (2d) at 1283, as follows: “But, since self-preservation is the first
 
 *767
 
 law of nations and states, as well as of individuals, it will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty . . . The taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable.” And the following is also pertinent: “This is not a contest between the federal government and the state as to jurisdiction. It is a contest between the state, asserting its concurrent, or partial, jurisdiction, and an individual who asserts that exclusive jurisdiction rests in the federal government. So far from there being any contest as to jurisdiction between the two sovereign powers, the record discloses that they are working in harmony and accord, each exercising the field for which it is the better equipped and each, at the same time, recognizing the field of the other. The federal government, therefore, cannot possibly be prejudiced by the result of this action.”
 

 So, in line with the applicable principle, the reserved power must be construed most strongly in favor of the state in order to preserve its jurisdiction as to matters with which it is directly and immediately concerned, and as to which jurisdiction has not been ceded or granted to the federal government. We find support also in
 
 Nikis
 
 v.
 
 Commonwealth,
 
 144 Va. 618 [131 S. E. 236, 46 A. L. R 219], where it was said: “That the right of a state to tax the property of others located upon lands owned by the United States, although it cannot tax such lands, will not be held to be abandoned by the state, except for the most compelling reasons, is quite manifest from several decisions of the Supreme Court of the United States.” It may be noted that it was there held that to be accorded immunity from state taxation it must be shown not only that the land was acquired by the United States, but also that it was acquired and used for one of the purposes indicated in article I, section 8, clause 17 of the Constitution.
 

 A consideration of the taxing statutes shows that the tax' is imposed respectively “upon retailers” (sec. 3, Stats. 1933, p. 2599, Stats. 1935, p. 1252) and upon “distributors” of gasoline, and it has so been held.
 
 {Roth Drug, Inc.,
 
 v.
 
 Johnson, supra,
 
 p. 736;
 
 People
 
 v.
 
 Herhert’s of Los Angeles, Inc.,
 
 3 Cal. App. (2d) 482 [39 Pac. (2d) 829];
 
 People
 
 v.
 
 Ventura Refining Co., supra,
 
 at page 294;
 
 Rio Grande Oil Co.
 
 v.
 
 Los
 
 
 *768
 

 Angeles,
 
 6 Cal, App. (2d) 200, 201 [44 Pac. (2d) 451].) This language in the statutes will not, of course, be construed to disturb the classification of taxable subjects— persons, property and business (State Tax on Foreign-Held Bonds, 82 U. S. (15 Wall.) 300, 319 [21 L. Ed. 179]; 26 R C. L., p. 34; 1 Cooley on Taxation, p. 172.) Neither does it mean that the excise taxes imposed should be considered as a tax “on persons” as a subject of taxation. The language of the statutes and the decisions still leaves the sales and gasoline taxes in the category of “excises” or tax on business. Nevertheless, as stated in volume 1, Cooley on Taxation, pages 68, 69, taxes are contributions from persons or property, and “whether a tax be considered as imposed on the person or on the property, it is clear that all taxes are imposed either upon the one or the other”. It seems obvious that the language of the reservation of the taxing-power contemplated the reservation to the state of the general taxing power without any exceptions other than that necessarily arising from the ownership of the land and property by the United States government. There is no inconsistency created by the express inclusion in the reserved power of the “right to fix and collect license fees for fishing in said parks”. Because of the nature of the privilege specially singled out, its express inclusion does not necessarily indicate that the taxing of all other privileges was intended to be excluded from the reservation. On the contrary it would seem that it was deemed necessary expressly to refer to that subject-matter, -as otherwise it might be claimed that the cession carried the exclusive supervision and regulation of fishing privileges in the streams included in the ceded areas.
 

 There is no merit in the contention that the privilege of making sales in the ceded areas emanate solely from the national government. The mere fact that the taxing power for all general purposes has been reserved by the state with the consent of congress is a recognition by the latter that the granting of such privileges emanates as well from the state.
 

 The main contentions urged to establish the invalidity of the reserved taxing power as here exercised by the state are answered adversely to the claims in the recent ease of
 
 Rainier Nat. Park Co.
 
 v.
 
 Martin,
 
 18 Fed. Supp. 481 (affirmed 302 U. S. 661 [58 Sup. Ct. 478, 82 L. Ed. ----]). There
 
 *769
 
 the power, exercised under a similar reservation, to impose on and collect a state retail sales tax' from the Rainier National Park Company was held to be valid and was sustained.
 

 In
 
 Yosemite Park & Curry Co.
 
 v.
 
 Collins, supra,
 
 it was held that the state of California had at one time ceded exclusive jurisdiction of Yosemite Valley to the United States, that the subsequent legislation attempting to reserve the taxing power was ineffective, and therefore that the state had no reserved power to enforce in Yosemite Valley the Alcoholic Beverage Control Act (1935 Stats., chap. 330). That act was there declared to be a complete liquor control measure, including provisions for license fees and excise taxes. Relative to the balance of Yosemite park, the court held that the reservation of the taxing power did not include the power to impose a license tax. For the reasons hereinabove stated, we are led to disagree with those conclusions of the court in that case. Nor do we perceive that they were necessary to its decision. The result in that case, if it be correct, is adequately supported by the final ground stated by the court, as follows: ‘ While a revenue measure does not preclude the possibility of a clash between sovereignties, it does not invite one as a regulatory measure does. California has ceded the park to the United States, which has agreed to police it. Now by reason of the Alcoholic Beverage Control Act, California evidently claims the retention of her police power. Such a claim is violative of the police jurisdiction placed in the hands of the national government, and is void. Since the primary purpose of California’s tax measure is the regulation of the intoxicating liquor business; since such regulation constitutes an exercise of the police power which is beyond the jurisdiction of the state, the measure cannot bestow upon California the power to collect license taxes from plaintiff for the importation and sale of liquors.”
 

 However the exercise of the reserved power by the imposition of retail sales and gasoline taxes creates no interference with the exercise of the jurisdiction acquired by the United States pursuant to the grants herein involved.
 

 The judgment in each case is affirmed.
 

 Rehearing denied.